## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF MICHIGAN

In Re:

Matchbox Business, LLC,

     Debtor.

_____/

Case No:  24-01263
Chapter 11, Subchapter V
Hon.  Scott W. Dales
Filed On: May 09, 2024


## MATCHBOX BUSINESS, LLC'S <mark>FIRST AMENDED</mark>[1] CHAPTER 11, SUBCHAPTER V, PLAN OF REORGANIZATION


Submitted By:

Steven M. Bylenga (P73492)
CBH Attorneys & Counselors, PLLC
25 Division Ave. S., Suite 500
Grand Rapids, Michigan 49503


Dated:  <mark>April 3, 2025</mark>

---

[1] All amendments are highlighted.

## EXHIBIT LIST

Exhibit A:    Cash Flow Projections

Exhibit B:    Liquidation Analysis

Exhibit C:    Executory Contracts

## CHAPTER 11, SUBCHAPTER V, PLAN OF REORGANIZATION

NOW COMES Matchbox Business, LLC ("**Debtor**"), by and through its attorneys, CBH Attorneys & Counselors, PLLC, and in accordance with the provisions of the United States Bankruptcy Code, hereby files its Chapter 11, Subchapter V, Plan of Reorganization (the "**Plan**"):

## ARTICLE I: INTRODUCTION

Through this Plan, Debtor proposes to reorganize under Subchapter V of Chapter 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**"), 11 U.S.C. § 1181 *et. seq.* The Plan provides for the restructuring and discharge of certain debts of Debtor, as set forth herein.  If confirmed by the United States Bankruptcy Court for the Western District of Michigan (the "**Court**"), the Plan will bind all creditors to the positions identified within the Plan.  However, until the Plan is confirmed by the Court, it is considered a proposal and will not bind any party, including Debtor.  All creditors should review the Plan, identify the proposed treatment of their claim, and consult with an attorney regarding the contents contained herein.

On May 9, 2024, Debtor filed its Bankruptcy Petition under Subchapter V of Chapter 11 of the Bankruptcy Code (the "**Petition**").  Debtor is a "small business debtor" as defined under 11 U.S.C. § 101(51D) and, therefore, qualifies for Subchapter V protection.  Debtor is currently operating as the "Debtor-in-Possession" as the term is defined in 11 U.S.C. § 1182(2).  Thomas C. Richardson was appointed as the Subchapter V Trustee to perform those duties set forth in 11 U.S.C. § 1183(b), including "facilitat[ing] the development of a consensual plan of reorganization."

If you have any questions regarding the Plan, you may contact Counsel for Debtor: Steven M. Bylenga, CBH Attorneys & Counselors, PLLC, 25 Division Ave S., Suite 500, Grand Rapids, MI 49503, (616) 608-3061.

All creditors should review the Plan, identify the proposed treatment of their claim, and consult with an attorney regarding the contents contained herein.  Debtor will provide ballots to creditors and solicit votes to determine acceptance or rejection of this Plan.

## ARTICLE II:  NATURE OF DEBTOR'S BUSINESS OPERATIONS AND FINANCIAL CONDITION

### 2.1.    Nature of Debtor's Business Operations

Debtor operates a restaurant located at 1345 Lake Dr. SE, Grand Rapids, Michigan 49506.

### 2.2    Events Leading to Bankruptcy

Debtor was incorporated on January 22, 2016 as "Brandywine Business, LLC"[2] by Eric Chaitin ("**Chaitin**") and James Bultema ("**Bultema**").  Neither Chaitin nor Bultema were involved with the day-to-day operations of Matchbox because they each had separate business interests outside of Debtor.  Instead, Debtor's day-to-day operations were managed by various general managers.

From 2016 through 2020, Debtor was generally profitable.  In the Spring of 2020, Debtor was forced to close for an extended period due to Michigan's "shelter-in-place" restrictions related to COVID-19.

When Debtor re-opened, its business did not immediately re-bound to pre-pandemic levels while consumers adjusted to post-pandemic eating options including expanded delivery options. In addition, Debtor's operating costs substantially increased due to post pandemic inflation.

Upon information and belief, Chaitin's other restaurants were similarly suffering from temporary shutdowns, lack of immediate return to pre-pandemic sale levels, and increased operating costs.

---

[2] The name was later changed to "Matchbox Business, LLC" on April 5, 2017.

In 2021, Debtor redeemed Bultema's membership interest making Chaitin the Debtor's sole member.  In the Spring of 2022, Chaitin authorized Debtor to obtain multiple Economic Injury Disaster Loans ("**EIDL**") from the Small Business Administration ("**SBA**").  Chaitin then used the EIDL loans to fund operations for Debtor and for two of his other restaurants, Ottawa Beach Business, LLC ("**Ottawa**") and Mermaid Business, LLC ("**Mermaid**").

Between January 1, 2022 and March 31, 2022, Chaitin ultimately authorized Debtor to obtain over $1,200,000.00 of EIDL loans from the SBA.  The majority of the EIDL loan proceeds were then re-loaned from Debtor to Ottawa and Mermaid to help fund their operations.  Debtor's loans to Ottawa and Mermaid were recorded on its balance sheet as long term accounts receivable, which offset the long term EIDL loan liabilities to the SBA.

In June of 2022, Nathan Orange ("**Orange**") purchased a 50% interest in Debtor.  From June of 2022 through Spring of 2023, Orange managed Debtor's day-to-day operations while Chaitin managed its finances.

In the Spring of 2023, Orange became aware of the significance of the EIDL loans and learned that Chaitin had also incurred additional debts in Debtor's name to help fund operations for Ottawa and Mermaid.  Orange confronted Chaitin and they mutually agreed that Orange would assume responsibility for managing Debtor's finances.

In the fall of 2023, Orange learned that Chaitin had pledged Debtor as a guarantor to certain merchant cash advance loans for Ottawa and Mermaid.  Despite the substantial funds provided by Debtor and other lenders, both Ottawa and Mermaid closed.

After Orange assumed control of Debtor's finances in addition to its day-to-day operations, Debtor was able to generate sufficient revenue to pay its ongoing expenses.  However, Debtor was

not able to generate sufficient revenue to re-pay the SBA or pay the guarantees for the merchant cash advance loans obtained by Ottawa and Mermaid.

In December of 2023, one of the merchant cash advance loans sued Debtor as a guarantor for a loan provided to Ottawa and Mermaid.[3]  Orange hired counsel to review Debtor's legal options related to its liabilities.  Based on counsel's explanation of options, Orange determined that reorganizing Debtor's liabilities through a Chapter 11, subchapter V, proceeding was its best course of action.  On May 9, 2024, Debtor filed its Petition.

### 2.3    Significant Events in Bankruptcy

After filing its Petition, Debtor operated as "debtor-in-possession" ("**DIP**") and fulfilled its procedural obligations, including:  filing its "first day motions," obtaining use of cash collateral for ongoing operations, closing its pre-petition bank accounts, opening DIP bank accounts at Huntington National Bank, paying post-petition adequate protection payments to Grand River Bank ("**GRB**"), attending the Initial Debtor's Interview with the United States Trustee's Office, attending the section 341 meeting of creditors, completing its post-petition reporting requirements, investigating third-party claims, negotiating proposed Chapter 11 plan terms with creditors to try to obtain consensual confirmation of its plan, and drafting this Plan to reorganize its liabilities.

### 2.4    Feasibility

A plan under Subchapter V of Chapter 11 "shall include . . .(b) projections with respect to an ability of the debtor to make payments under the proposed plan of reorganization." 11 U.S.C. § 1190(1)(C).  In other words, a Debtor's plan must detail how the plan is feasible.

As demonstrated by Debtor's "**Cash Flow Projections**" attached hereto as "**Exhibit A,**" Debtor's projected revenue is sufficient to fund the payments required under this Plan, including:

---

[3] AKF, Inc., d/b/a Fundkite v. OBI Business, LLC, et al.  (Supreme Court of the State of New York, New York County, Index No. 656339/2023)

(i) its ongoing costs of operation; (ii) payment to the SBA for the "crammed down" portion of its secured claim; (iii) all administrative and priority claims; and (iv) a reasonable distribution to its unsecured creditors.

Over approximately 10 months between Orange assuming control of Debtor's finances and the Petition Date, Debtor was able to generate sufficient revenue to pay its ongoing operational costs, pay GRB approximately $3,000.00 per month, and generate net income. Debtor's ability to pay its ongoing operational costs, pay GRB approximately $3,000.00 per month, and generate additional net disposable income was further confirmed by its operations while acting as DIP during this proceeding.

As provided in more detail herein, Debtor will pay its first position secured creditor, GRB, in full on the Effective Date and utilize the now available remaining cash flow of approximately $3,000.00 to fund payments to the SBA on the secured portion of its claim. The payment to GRB will be made from funds Debtor receives from Orange in satisfaction of his outstanding payable to Debtor.

In addition to generating sales revenue to pay operating expenses and debt payments provided for in this Plan, Debtor may also satisfy the feasibility requirement through:

> **(A)** **Receivables from Orange and Brandywine Property, LLC**: Debtor is owed $50,000.00 from Orange from a loan provided to Orange in 2022 to purchase Bultema's shares of Brandywine Property, LLC ("**BP**")[4]. Debtor is also owed $10,000.00 from BP. Orange and BP will both pay the full amount of the outstanding claims against them in full prior to the Effective Date.

> **(B)** **Avoidance Actions under Section 547(b)**: Debtor intends to pursue viable Avoidance Actions. Any net proceeds recovered, after payment of costs and administrative fees related to the recoveries, will be paid to general unsecured creditors under either consensual or non-consensual confirmation, as described in more detail herein.

---

[4] BP is a separate holding company owned by Orange that owns the real property that Debtor leases for its operations.

    **(C)**    **Third Party Claims**.  In addition to any Avoidance Actions, Debtor will also continue to investigate potential third-party claims against Chaitin, Chaitin's business entities, and any other third parties that Debtor may have a claim against in contract, tort, or equity.  All net proceeds, after payment of costs and administrative fees related to the recovery of any claim against third-parties, will be paid to general unsecured creditors under either consensual or non-consensual confirmation, as described in more detail herein.

**2.5**    **Liquidation Analysis**

Under 11 U.S.C. § 1190(1)(B), a Chapter 11 plan of reorganization filed by a Subchapter V Small Business Debtor must include "a liquidation analysis."  Debtor's "**Liquidation Analysis**" is attached hereto as "**Exhibit B**."  Debtor's Liquidation Analysis demonstrates that, were Debtor to liquidate, GRB would receive an estimated distribution of $50,025.38; SBA would receive an estimated distribution of $136,732.62;[5] and **all** other creditors would receive $0.00.

Under Debtor's Plan, all impaired claims receive better treatment than they would in a Chapter 7 liquidation, including: (i) immediate payment of GRB's secured claim of $50,025.38: (ii) payment to the SBA of the $136,732.62 secured portion of its claim plus the largest percentage of the *pro rata* share of the distribution to unsecured non-priority claims; (iii) full payment of all administrative claims and unsecured claims entitled to priority; and (iv) *pro rata* distributions to unsecured non-priority claims, the amount of which will be determined pursuant to the "consensual" or "non-consensual" terms contained herein.

<u>Accordingly, Debtor asserts that all creditors will receive significantly higher distributions by voting for Debtor's confirmed plan than if Debtor liquidates its assets through a Chapter 7 proceeding.</u>

---

[5] The estimated liquidation distribution to SBA does not include any deductions for cost-of-sale, collectability, or trustee/admin fees.  Debtor believes that the net proceeds in a liquidation would be substantially lower after these the sale proceeds were reduced by these factors.  However, as a sign of good faith, when Debtor calculated the secured portion of the SBA's claim it included the full value of its assets as provided in its initial Schedules.

### 2.6 Avoidance Actions

The Small Business Reorganization Act ("**SBRA**") introduced significant procedural restrictions for small business debtors to pursue recovery of transfers to non-insiders.  As amended by the SBRA, 28 U.S.C. § 1409(b) requires small business debtors to bring Avoidance Actions for less than $25,000.00 in the district where the defendant resides.  Furthermore, the SBRA also amended 11 U.S.C. § 547(b) to require small business debtors to consider a party's statutory defenses "based on reasonable due diligence in the circumstances of the case and taking into account a party's known or reasonably knowable affirmative defenses under subsection (c)."

As disclosed in Debtor's Statement of Financial Affairs, many of the creditors receiving payment(s) in the 90 days preceding Debtor's Petition Date were under the $25,000.00 threshold. In addition, Debtor believes, based upon reasonable inquiry and due diligence under the circumstances, that many of the ordinary creditors receiving payment(s) in the 90 days preceding Debtor's Petition Date may also have "new value" and/or "ordinary course" defenses because Debtor operated in the ordinary course of business until the Petition Date.  Accordingly, Debtor believes that it would be cost-prohibitive to pursue avoidance actions against most of its ordinary creditors that received payments in the 90 days preceding the Petition Date.  However, Debtor will continue to review potential Avoidance Actions against non-insiders and reserves the right to pursue viable Avoidance Actions.

Debtor is also investigating potential Avoidance Actions against insiders related to the use of the EIDL funds.  To the extent that Debtor, in its discretion, determines that viable Avoidance Actions exist against insiders related to the EIDL funds, or any other viable claim for an Avoidance Action, Debtor will pursue such Avoidance Actions against insiders.

Any net recovery, after costs and administrative expenses, from Avoidance Actions brought against insiders or non-insiders will be paid to unsecured, non-priority, claims as described in more detail herein.

**2.7    Third Party Claims**

In addition to investigating and pursuing Avoidance Actions, Debtor also seeks to maximize the value of its potential claims against third parties for the benefit of its creditors.  In determining which claims it will pursue, Debtor will use its best judgment under the "Business Judgment rule."  Debtor's potential claims against third parties include:

A.    **$50,000.00 Receivable from Nate Orange:** In 2022, Debtor provided Orange with a loan for $100,000.00.  Orange used the loan proceeds to purchase Bultema's membership interest in BP.  Prior to the Petition Date, Orange repaid $50,000.00 of the $100,000.00 he owed to Debtor.[6]  Under this Plan, Orange will re-pay the remaining $50,000.00 via a lumpsum payment due prior to the Effective Date.

B.    **$10,000.00 Receivable from Brandywine Property, LLC**:  Debtor has a $10,000.00 claim for an outstanding receivable against BP.  BP will pay the $10,000.00 receivable in full prior to the Effective Date.

C.    **Claims Against Chaitin, Ottawa, and Mermaid.**  Debtor may have claims against Chaitin, Ottawa, Mermaid and/or other related entities related to the use of Debtor's funds.  Such claims may include, but not be limited to, breach of contract, breach of fiduciary duty, conversion, promissory estoppel, and/or unjust enrichment.  Chaitin provided Debtor with information and documents related to his use of the

---

[6] Orange's father loaned him $50,000.00.  The $50,000.00 was primarily used to pay administrative retainers related to this proceedings, including $27,500.00 to CBH and $15,000.00 to Stonehenge Consultants, LLC.

EIDL funds.  Chaitin also indicated, through his counsel, that he may have defenses to any claims.

Debtor has initiated investigations into its third-party claims and negotiated immediate full recoveries of its claims against Orange and BP.  Debtor will continue to investigate the viability and collectability of its remaining third-party claims[7] and reserves the right to pursue third-parties. Prior to December 31, 2025, Debtor will: (i) file complaints against third-parties; (ii) file motion(s) to settle third-party claim(s); and/or (iii) file a motion to abandon third-party claim(s).  If Debtor files a motion to settle or abandon a third-party claim, Debtor will file the motion upon all parties in interest with notice and opportunity to object and an explanation of the factors Debtor relied upon to settle or abandon the claim.

## ARTICLE III: DEFINITIONS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW

### 3.1    Definitions

As used in the Plan, the following terms shall have the respective meanings specified below, except as expressly provided otherwise.  Any term or terms used in the Plan, but not identified below, shall have the meaning ascribed to them by the Bankruptcy Code.

A.    "**Administrative Creditor**" shall mean a claim for costs and expenses of administration allowed under 11 U.S.C. § 503(b) and 11 U.S.C. § 507(b).

B.    "**Allowed Claim**" shall mean a Claim or portion of a Claim, which is not a disallowed claim, and as to which: (i) a Proof of claim was timely filed with the Clerk's Office on or before any bar date, as applicable; (ii) a Proof of Claim was not required to be so filed, was deemed timely filed, and/or (iii) either no objection to the allowance of such Claim has been filed or by  order

---

[7] Upon information and belief, the United States Attorney's Office has obtained additional financial records relevant to the review and analysis of potential third-party claims.  Debtor has requested copies of certain documents obtained by the United States Attorney's Office, which Debtor believes will provide sufficient information for it to determine the validity and extent of potential claims.

of the Bankruptcy Court, withdrawal of an objection, or settlement of an objection, such objection to a claim has been overruled, withdrawn, or settled. "Allowed Claim" shall also include a Claim that is allowed under the Plan or by the Bankruptcy Court.

C. "**Avoidance Actions**" shall mean any cause of action which the Debtor may maintain pursuant to 11 U.S.C. § 542, § 543, § 544, § 545, § 547, § 548, § 549, § 550, and § 551.

D. "**Bankruptcy Code**" shall mean the Bankruptcy Reform Act of 1978, as amended, codified in Title 11 of the United States Code and the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005.

E. "**Bankruptcy Rules**" shall mean the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the United States Bankruptcy Court for the Western District of Michigan, as now in effect or hereafter amended.

F. "**Class**" shall mean any class of creditors or interests described in this Plan.

G. "**Confirmation Date**" shall mean the date on which the Bankruptcy Court signs the Confirmation Order.

H. "**Confirmation Order**" shall mean the Order of the Bankruptcy Court confirming the Plan pursuant to 11 U.S.C. § 1191.

I. "**Court**" shall mean the United States Bankruptcy Court for the Western District of Michigan including, but not limited to, the Honorable Scott W. Dales, Bankruptcy Judge presiding.

J. "**Debtor**" shall mean Matchbox Business, LLC.

K. "**Disputed Claim**" shall mean any claim that has been scheduled by the Debtor as disputed, contingent, or unliquidated; or in which the Debtor or another party in interest has filed an Objection.

L. "**Distribution(s)**" shall mean a distribution of cash or property, to a creditor pursuant to the terms of the Plan, including payments made prior to confirmation as set forth in the Plan.

M. "**Effective Date**" shall mean 14 days after the entry of the Confirmation Order.

N.     "**Estate**" shall mean the estate created for the Debtors in its Chapter 11 Reorganization proceeding pursuant to 11 U.S.C. § 541

O.     "**Filed**" shall mean filed with the United States Bankruptcy Court for the Western District of Michigan.

P.     "**Final Order**" shall mean an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, as entered, which has not been reversed, stayed, modified or amended, and as to which the time to appeal has expired.

Q.     "**Petition Date**" shall mean May 9, 2024.

R.     "**Plan**" shall mean this Plan of Reorganization and all exhibits referenced herein.

S.     "**Priority Claim**" shall mean any claim to the extent it is entitled to a priority in payment pursuant to 11 U.S.C. § 507(a) or (b).

T.     "**Reorganized Debtor**" shall mean the Debtor on and after the effective date.

U.     "**Trustee**" shall mean Thomas C. Richardson, the Subchapter V Trustee appointed to this proceeding under 11 U.S.C. § 1183(a).

**3.2     Rules of Interpretation**

For purposes of the Plan, the Rules of Interpretation shall be as follows:

A.     Any reference in the Plan to a contract, instrument, release, agreement, document, or stipulation being in a particular form or on particular terms means that such document shall be substantially in such form or substantially on such terms;

B.     Any reference in the Plan to an existing document or exhibit filed or to be filed means such document or exhibit, as it may have been or may be amended or modified;

C.     Captions and headings to Articles are inserted for convenience of reference only and are not intended to affect the interpretation of the Plan; and

D.     The rules of construction as set forth in section 102 of the Bankruptcy Code shall apply.

**3.3    Computation of time**

Bankruptcy Rule 9006(a) shall apply to the computation of any time period.

**3.4    Governing Law**

Except to the extent that the Bankruptcy Code or Bankruptcy Rules are applicable, and subject to the provisions of any contract, instrument, agreement, or document entered into in connection with the Plan, the rights and obligations arising under the Plan shall be governed by and construed and enforced in accordance with the laws of the State of Michigan, without giving effect to the principles of conflict of laws.

## ARTICLE IV: OPERATION OF THE PLAN

The Debtor shall, through its operations and recovery of third-party claims, make payments to secured, administrative, priority, unsecured claims as further set forth herein.

## ARTICLE V: CLASSIFICATION OF CLAIMS

**5.1    Class 1, Administrative Claims**

This class consists of all expenses of administration that have not been paid.  This class shall also include any charges for fees entitled to priority under 11 U.S.C. § 507(a)(2).  This class includes, but is not limited to:

      A.      Debtor's pre-confirmation attorney fees and costs;

      B.      Debtor's pre-confirmation accounting/financial advising fees and costs;

      C.      Debtor's pre-confirmation bookkeeping fees and costs; and

      D.      Debtors' pre-confirmation Subchapter V Trustee fees.

### 5.2    Class 2, Priority Claims

This class consists of the priority claims of governmental entities, including the Internal Revenue Service in the amount of $3,601.04 [Claim 7];[8] the Michigan Department of Treasury in the amount of $14,204.78 [Claim 10];[9] and the Michigan Unemployment Insurance Agency in the estimated amount of $7,188.44 [Claim No. 5][10]

### 5.3    Class 3, Unimpaired Secured Claim of Grand River Bank

This class consists of the pre-petition secured claim of GRB in the aggregate amount of $50,025.38 [Claim 2], which are secured by a first priority security agreement and UCC Financing Statement against Debtor's personal property, including its accounts, equipment, inventory, and receivables.  The value of Debtor's collateral exceeds the aggregate amount of Grand River Bank's claim.

### 5.4    Class, 4, Impaired Secured Claims

This class consists of the impaired secured claims of:

A.    <u>U.S. Small Business Administration</u>

SBA holds claims in the aggregate amount of $1,374,122.00, which are secured by a second priority security agreement and UCC Financing Statement against Debtor's personal property, including its accounts, equipment, inventory, and receivables. [Claim No 4].  SBA's claims exceed the value of its collateral.  Accordingly, as provided in more detail herein, $136,732.62 of SBA's claims will

---

[8] Debtor does not believe that the IRS holds a pre-petition claim against Debtor.  The IRS initially filed a notice of deficiency related to Debtor's 940/941 returns; however, Debtor subsequently provided the IRS with information and documentation indicating that its third-party payroll provider completed its 940/941 returns and made the required payments. Debtor anticipates that this claim will be amended to reflect a balance of $0.00.

[9] This amount is primarily comprised of sale's tax and interest that accrued in the month prior to the Petition Date.

[10] Debtor does not believe that the Michigan Unemployment Insurance Agency holds any pre-Petition claims against the Debtor.

be treated as secured and the remaining balance will be treated as a general unsecured claim under Class 5.

B.    AKF, Inc. d/b/a Fundkite

AKF, Inc. d/b/a Fundkite ("**AKF**") holds a secured claim in the amount of $185,979.50, which is secured by a third position security agreement and UCC Financing Statement against Debtor's receipts.  [Claim No. 6]  AKF's claims are wholly unsecured as the combined amount of GRB's and SBA's superior secured claims exceed the value of Debtor's assets.  Accordingly, as described in more detail herein, its claim will be paid entirely under Class 5.

C.    Cloudfund, LLC

Cloudfund, LLC ("**Cloudfund**"), a creditor whose claim was listed as disputed, failed to file a Proof of Claim as required by the Court's "Order and Notice of Claims Bar Date."  [Dkt. No. 44]  Cloudfund's claim was therefore deemed disallowed and "forever barred, estopped, and enjoined from asserting any pre-petition claim against Debtor."  Accordingly, Cloudfund is not permitted to vote on the Plan and will not receive a distribution under the Plan.

**5.5    Class 5, Unsecured Non-Priority Claims**

This class consists of Debtor's unsecured non-priority creditors, including, but not limited to: vendor claims; promissory notes; guarantees, indemnifications (including indemnifications of Members under Debtor's Operating Agreement), breaches of contract, estoppel claims, torts, deficiency balances from secured claims and leases; any portion of a governmental entity claim not entitled to priority; and the unsecured portion of impaired secured claims being "crammed down" or treated as "wholly unsecured."

**5.6     Class 6, Equity Security Holders**

This class consists of Debtor's equity security holders.

## ARTICLE VI: STATEMENT REGARDING IMPAIRMENT OF CLAIMS

Classes 1 and 3 shall be unimpaired.  All other classes are impaired.

## ARTICLE VII: PRO RATA DISTRIBUTIONS

Unless otherwise specified in the Class treatment, for any class of claims that are impaired under the Plan, funds to be distributed to such class under the Plan shall be divided *pro rata* among holders of allowed claims of such class, based on the amount of the allowed claims(s) for such claimant(s).

## ARTICLE VIII: EXECUTORY CONTRACTS

**8.1     Executory Contracts:**  The Debtor will assume, pursuant to the terms and conditions of the Executory Contract Assumption Terms attached hereto as "**Exhibit C**," certain executory contracts.  All executory contracts and/or leases not specifically assumed in Exhibit C are rejected.

## ARTICLE IX: TREATMENT OF CLASSES

**9.1     Class 1, Administrative Claims**

This class consists of all fees and expenses of administration that have not been paid.  The fees and expenses of professionals shall be subject to Court approval.  Such claims shall be paid as set forth below:

        A.     Debtor's pre-confirmation attorney's fees and expenses to CBH Attorneys & Counselors, LLC ("**CBH**"), which Debtor estimates to be $30,000.00, shall be paid as follows:

            (i)     $5,619.00 on the Effective Date from funds being held in trust by CBH;

  (ii)  $10,000.00 on the Effective Date from Debtor; and

  (iii)  Any remaining balance to be paid by Debtor through monthly payments of at least $1,000.00 per month until paid in full.

B.  Debtor's pre-confirmation accounting and financial advising fees and expenses to Stonehenge Consulting, PLC ("**Stonehenge**"), which Debtor estimates to be $15,000.00, shall be paid as follows:

  (i)  $6,515.00 on the Effective Date from funds being held by Stonehenge; and

  (ii)  $3,485.00 on the Effective Date by Debtor; and

  (iii)  Any remaining balance, if any, to be paid through monthly payments of at least $500.00 per month until paid in full.

C.  Debtor's pre-confirmation accounting and financial advising fees and expenses to NewMark Concepts, LLC ("**NewMark**"), which Debtor estimates to be $7,500.00, shall be paid as follows:

  (i)  $5,000.00 on the Effective Date by the Debtor; and

  (ii)  Any remaining balance to be paid through monthly payments of at least $500.00 per month until paid in full.

D.  Debtors' administrative fees to the Subchapter V Trustee, which Debtor estimates to be $10,000.00, shall be paid in full on the Effective Date.

**9.2  Class 2, Unsecured, Priority Claims**

Priority tax claims are considered unclassified for purposes of a Chapter 11 reorganization Plan. 11 U.S.C. § 1123(a)(1). Governmental units with priority tax claims must receive, over the life of a plan, an "amount equal to the allowed amount of such claim" "in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the plan." 11 U.S.C.

§ 1129(a)(9)(D).   Where a governmental entity has a secured tax claim under 11 U.S.C. § 507(a)(8), it must be treated and paid in the same manner and time period as a tax priority claim under 11 U.S.C. § 507(a)(8).  11 U.S.C. § 1129(a)(9)(D).  Upon the failure of the Debtor to make any payment due on a priority tax claim that is not cured within 30-days of the mailing of a written notice of default by the creditor, such creditor may exercise all remedies available under non-bankruptcy law for the collection of its entire claim or seek appropriate relief from the Bankruptcy Court.

Debtor's Plan is due within 90 days of the Petition Date while governmental entities are not required to file claims for 180 days after the Petition Date.  Accordingly, while Debtor made a good faith effort to accurately and completely address any claims of governmental entities, Debtor reserves the right to amend the Plan to address any claims from governmental entities that are not fully and completely addressed through the Plan.

The Debtors' priority tax claims include:

A.   Internal Revenue Service

The Internal Revenue Service ("**IRS**") filed a claim for $3,601.04, of which the IRS claims $3,313.94 as priority.  [Claim 7]  Debtor believes that the claim was fully paid and the IRS will amend its claim to reflect a balance of $0.00.  However, to the extent that the IRS' claim is valid, the IRS' claim shall be treated as set forth below:

(i)      Debtor shall pay the IRS' unsecured, pre-petition, priority tax claim in full within 60 months of the Petition Date through payments of at least $200.00 per month.

(ii)     The IRS' pre-petition, unsecured, priority tax claim shall be paid ongoing interest as determined in the calendar month for which the Plan is confirmed.

(iii)    Any unsecured, non-priority, pre-petition IRS claim will be paid according to Class 5.

(iv)    Debtor reserves the right to amend its proposed payments to the IRS upon the IRS filing a claim; provided however, that any secured or priority claims must be paid in full within 60-months from the Petition Date.

B.  <u>Michigan Department of Revenue</u>

The Michigan Department of Treasury ("**<u>MDT</u>**") filed a claim for $14,204.78, of which the MDT claims $8,717.67 is priority.  [Claim 10]   MDT's claim shall be treated as follows:

(i)    Debtor shall pay MDT's unsecured, pre-petition, priority tax claims of $8,717.67 at the rate of at least $250.00 per month until paid in full.

(ii)    MDT's unsecured, pre-petition, priority tax claims shall be paid ongoing interest as determined in the calendar month for which the Plan is confirmed.

(iii)    Any unsecured, non-priority, pre-petition MDT claim shall be paid according to Class 5.

(iv)    Debtor reserves the right to amend its proposed payments to MDT upon MDT filing a claim; provided however, that any secured or priority claims must be fully paid within 60 months from the Petition Date.

C.  <u>Unemployment Insurance Agency</u>

The State of Michigan Unemployment Insurance Agency ("**<u>UIA</u>**") filed a claim for $7,188.44, of which the UIA claims $4,380.65 as priority.  [Claim 5]  The UIA's claim shall be treated as follows:

(i)    Debtor shall pay UIA's unsecured, pre-petition, priority claim of $4,380.65 at the rate of at least $200.00 per month.

(ii)    The priority portion of UIA's claim shall receive interest at the rate of 3%.

(iii)    UIA's remaining unsecured non-priority claim will be paid according to Class 5.

### 9.3    Class 3, Unimpaired Secured claim of Grand River Bank

GRB holds a secured claim in the amount of $50,025.38[11] for promissory notes and security agreements related to loans provided for the operation of Debtor [Claim 2].  This claim shall be treated as <u>unimpaired</u> and paid pursuant to the terms, conditions, and provisions of the Note which are all hereby incorporated by reference and shall provide evidence of Debtor's post-confirmation obligations to GRB; EXCEPT as modified as set forth below:

A.    The full balance of $50,025.38 shall be paid in full on the Effective Date.

B.    GRB shall retain its pre-petition liens on Debtor's assets described in security agreements and UCC financing statement in existence on the Petition Date to the same validity, extent, and priority as existing as of the Petition Date, except with respect to the payment terms set forth above.  The terms of such security agreements and UCC financing statements are incorporated herein by this reference and shall provide and evidence the Debtor's post-confirmation obligations to GRB.

### 9.3    Class 4, Impaired Secured Claims

A.    <u>U.S. Small Business Administration</u>

SBA holds a partially secured claim in the aggregate amount of $1,374,122.00 for promissory notes and security agreements related to EIDL loans provided for the operation of Debtor, which include "**Note XXX7201**," with a principal balance of $412,659.10, and "**Note XXX9106**," with a principal balance of $961,463.61[Claim 4].  SBA's claim shall be paid pursuant to the terms, conditions, and provisions of Note XXX7201 and Note XXX9106, which are all

---

[11] GRB filed Claim 2 on May 23, 2024.  Debtor has continued to pay GRB, pursuant to entry of the Order approving use of cash collateral, the full contractual payment of $3,036.69.  A portion of the post-petition payments were applied against the principal balance.  Accordingly, on the Effective Date, the balance owed to GRB will be less than the amount listed in this Plan.

hereby incorporated by reference and shall provide evidence of Debtor's post-confirmation obligations to SBA; <u>EXCEPT</u> as modified as set forth below:

**A. Note XXX7201**:

(i) Note XXX7201 shall be treated as secured in the amount of $136,732.62[12] ("**Secured SBA Balance**"), which shall be amortized over 48 months at an interest rate of 3.75%.[13]

(ii) SBA shall receive monthly payments of $3,000.00 per month on the Secured SBA Balance with payments beginning the first day of the month following the Effective Date.

(iii) The full remaining balance of the Secured SBA Balance, as modified herein, shall mature and be paid in full in month 48 following the Effective Date.

(iv) The remaining unsecured portion of Note XXX7201, in the amount of $275,926.48, shall be treated as an unsecured non-priority claim and paid solely pursuant to Class 5.

**B. Note XXX9106**

Note XXX9106 is wholly unsecured. Accordingly, Note XXX9106's entire principal balance of $961,463.61 shall be treated as an unsecured non-priority claim and paid solely pursuant to Class 5.

**C. Lien Retention**

SBA shall retain its pre-petition liens on Debtor's assets described in security agreements and UCC financing statement in existence on the Petition Date to the same validity, extent, and priority as existing as of the Petition Date, except with respect to the secured balance, interest rate, and payments terms set forth above. The terms of such security agreements and UCC financing statements are incorporated herein by this reference and shall provide and evidence the Debtor's post-confirmation obligations to SBA.

---

[12] As demonstrated by Debtor's Liquidation Analysis attached hereto as Exhibit B, on the Petition Date Debtor's assets were valued at $186,758.00 and GRB possessed a first position lien on Debtor's assets in the amount of $50,025.38, which resulted in SBA's second position lien on Debtor's assets being secured to the remaining value of $136,732.62.
[13] Contract interest rate from NoteXXX7201.

B.    AKF, Inc. dba Fundkite

AKF holds a secured claim in the aggregate amount of $185,979.50 for a loan to Ottawa guaranteed by Debtor, which are secured by a security agreement and UCC Financing Statement [Claim No. 6].  This is wholly unsecured.[14]  Accordingly, AKF's claim shall be paid solely in accordance with Class 5.

C.    Cloudfund

Cloudfund holds a secured pre-petition claim under a guarantee and security agreement related to loans provided to OBI and Mermaid.  Cloudfund's claim was listed as "disputed" in Debtor's Schedules.  The "Order and Notice of Claims Bar Date" entered by the Court on June 10, 2024, required any "disputed" claim to file a Proof of Claim with the Court prior to the General Bar Date of July 10, 2024.  Cloudfund failed to file a Proof of Claim prior to the General Bar Date. Cloudfund's claim was therefore disallowed and "forever barred, estopped, and enjoined from asserting any pre-petition claim against Debtor."  Accordingly, Cloudfund is not permitted to vote on Debtor's Plan and Cloudfund will not receive a distribution.

**9.5    Class 5, Unsecured, Non-Priority Claims**

This class consists of all unsecured, non-priority claims, including, but not limited to: vendor claims, promissory notes, guarantees, indemnifications (including indemnifications of Members under Debtor's Operating Agreement), breaches of contract, estoppel claims, torts, deficiency balances from secured claims or leases; any portion of a governmental entity claim not entitled to priority; and the unsecured portion of impaired secured claims being "crammed down"

---

[14] As demonstrated by Debtor's Liquidation Analysis attached hereto as Exhibit B, on the Petition Date Debtor's assets were valued at $186,758.00; GRB possessed a first position lien on Debtor's assets in the amount of $50,025.38; and SBA possessed a second position lien on Debtor's assets of $1,374,122.00, which resulted in AKF's third position lien on Debtor's assets being wholly unsecured.

or treated as "wholly unsecured."   The Debtor estimates that the unsecured non-priority claims in this estate will be approximately $5,700.000.00[15] (the "**General Unsecured Claims**").

A. **Treatment in Consensual Plan**

If Debtor's plan is confirmed as "consensual," within the meaning of 11 U.S.C. §1191(a), then General Unsecured Claims shall receive a *pro rata* share of $60,000.00[16] (the "**Consensual General Unsecured Claim Base**").  The Consensual General Unsecured Claim Base shall be satisfied through *pro rata* semi-annual payments of at least $6,000.00.[17]  The semi-annual payments of at least $6,000.00 shall be paid on or before the first day of March and the first day of September until the total base has been distributed to creditors.  The first semi-annual payment shall be due on or before December 1, 2025.

B. **Treatment in Non-Consensual Plan**

If Debtor's Plan is confirmed as "non-consensual," then the General Unsecured Claims shall receive a *pro rata* share of $27,000.00 (the "**Non-Consensual General Unsecured Claim Base**").  Debtor's Plan must provide for all of its "**projected** disposable income," (emphasis added) for 36 to 60 months.  Debtor's projected disposable income is $1,000.00 per month. However, in a non-consensual plan, Debtor will continue to incur additional administrative costs estimated at $250.00 per month, which effectively reduces Debtor's projected disposable income to $750.00 per month under a non-consensual plan.   Accordingly, Debtor asserts that General Unsecured Creditors receive a significantly higher distribution under its proposed consensual distributions.

---

[15] The General Unsecured Claims are primarily related to claims by the SBA and United States of America for civil penalties regarding Debtor's use of EIDL Loan proceeds.

[16] The $60,000.00 pro rata distribution is equivalent to five years of Debtor's projected disposable income of $1,000.00 per month, which provides creditors with two years of additional disposable income above the 36 month minimum payment term.

[17] Projected monthly disposable income of $1,000.00 per month every 6 months.

C.    **Net Proceeds from Avoidance Actions**

Under either consensual or non-consensual confirmation General Unsecured Claims will, in addition to the distributions provided for in paragraphs 9.5 (A) or (A), also receive *pro rata* distributions of the net proceeds, after reduction for costs and administrative fees as approved by the Court, recovered under any Avoidance Actions or Third-Party Claims.

**9.6    Class 6, Equity Security Holders**

This Class consists of Orange and Chaitin's equity interest in Debtor.  In its current financial condition, Debtor's Membership Interests have minimal, if any, value other than as a source of wages for work performed.[18]  In addition, the value of Chaitin's shares are impaired by potential claims of the Debtor and/or Orange to expel Debtor.  However, rather than accruing the cost and uncertainty of litigation related to the validity and value of Chaitin's Membership Interest, Orange has agreed to purchase Chaitin's membership interest pursuant to the terms and conditions contained herein.[19]

Debtor's Operating Agreement provides that Members may agree to a valuation for the purpose of purchasing another Member's Interest.  Orange and Chaitin agree to value Debtor, as a Chapter 11 debtor with significantly more secured liabilities than assets, at $20,000.00.  Orange will purchase Chaitin's 50% Membership Interest for $10,000.00; provided however, that the sale of Chaitin's Membership Interest will be delayed until Orange (or another company representative) has been approved by the Michigan Liquor Control Commission ("**MLCC**") as the responsible party for Debtor's liquor license.   The sale of Chaitin's interest to Orange will close within 30 days of the MLCC approving Orange (or another approved representative).    Regardless of

---

[18] See Debtor's Liquidation Analysis.
[19] This section is specifically limited to establishing the value of Chaitin's Membership Interest and the procedure for Orange to purchase it.  Nothing contained herein shall be interpreted as a waiver or release of any claims Debtor may have against Chaitin.

Debtor's post-confirmation performance, the value of Chaitin's Membership Interest will remain unchanged.

Prior to the Effective Date Orange will deposit the $10,000.00 purchase price for Chaitin's Membership Interest into CBH'S IOLTA account to be held until closing.

## ARTICLE X: VOTING

### 10.1    Consensual Plan and Voting of Claims

Under the Bankruptcy Code, the Debtor can confirm the Plan in one of two ways: (i) on a consensual basis under sections 1191(a) and 1129(a) of the Bankruptcy Code, which requires that the impaired creditors vote in favor of the Plan; or (ii) on a non-consensual basis under section 1191(b) of the Bankruptcy Code, which provides that the Plan can be confirmed under the "cram down" provisions of the Bankruptcy Code.

Each holder of an allowed claim in an impaired class of claims shall be entitled to vote or reject the Plan as provided in such order as is entered by the Bankruptcy Court establishing procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order(s) of the Bankruptcy Court.  A claim is "impaired" if, among other components, the plan alters "the legal, equitable, [or] contractual rights to which such claim . . . entitles the holder of such claim[.]" 11 U.S.C. § 1124(1).  In other words, a claim is impaired where any right of the claim holder, be it amount paid, interest rate, or length of the secured interest payments, is altered by the Plan.  A class will be deemed to have accepted the plan where greater than half of the class members vote in favor of the Plan **and** at least two-thirds (or 66.7%) of the voting amount, in dollars, votes in favor of the Plan.  See 11 U.S.C. § 1126(c).

### 10.2    Non-Consensual Plan Confirmation

If any impaired class of claims entitled to vote does not accept the Plan by the requisite statutory majorities as imposed by Section 1126(c), Debtor reserves the right to amend or modify the Plan as set forth in Article XII of the Plan.

Alternatively, if an impaired class of claims rejects the Plan, Debtor may request the Bankruptcy Court to confirm the Plan under 11 U.S.C. § 1191(b).  Under Section 1191(b), the Court "shall confirm the plan . . . if the plan does not discriminate unfairly and is fair and equitable with respect to each class of claims or interests that is impaired under, and has not accepted, the plan."  A Subchapter V plan is fair and equitable where: (1) secured creditors retain their lien up to the value of the collateral and, over the life of the plan, are paid the value of the creditor's interest in the collateral; (2) all projected disposable income of the debtor over the life of the plan is applied to make payments under the plan; and (3) there is a reasonable likelihood that the debtor will be able to make all payments under the plan.  11 U.S.C. § 1129(c).

Debtor's Plan is fair and equitable because it: (i) provides that secured creditors, as modified and provided for herein, will retain their liens up to the value of their collateral, and will be paid the value of their collateral, plus interest, over the life of the plan; (ii) provides that the plan is feasible and that all projected disposable income will be paid to creditors, as demonstrated by Debtor's Cash Flow Projections; and (iii) pays creditors at least as much as they would receive in a Chapter 7 liquidation, as demonstrated by Debtor's Liquidation Analysis.

### ARTICLE XI: PROVISIONS GOVERNING FUNDING OF THE PLAN, DETERMINATION OF CLAIMS AND DISTRIBUTIONS

### 11.1    Funding for the Plan

Payments required under the Plan will be made from: (i) Debtor's sales revenue as projected in Debtor's Cash Flow Projection, and (ii) funds recovered from third-party claims.

### 11.2    11 U.S.C § 1111(b)(2) Election by Secured Creditors

Under 11 U.S.C. § 1111(b)(2), secured creditors may elect to have an undersecured claim treated as a fully secured claim to the extent such a claim is allowed.  Should any secured creditor make such an election, Debtor will treat their claim in compliance with Section 1111(b)(2).

### 11.3    Determination of Claims

From and after the Effective Date, the Reorganized Debtor shall have the authority to file, settle, compromise, withdraw, or litigate to judgment all objections to claims.

### 11.4    Distributions

All distributions under the Plan shall be made in accordance with the priorities established herein.  Any cash payment made pursuant to the Plan may be made by check or wire transfer. Distributions to holders of Allowed Claims will be made as follows: (i) at the respective addresses set forth in the Schedules unless superseded by the address set forth in the proofs of claim filed by the claim holder; (ii) at the address set forth in any written notice of address change delivered to Debtor after the date of filing of any proof of claim; or (iii) through wire transfer as provided to Debtor prior to the first distribution under the Plan or with thirty days' notice thereafter.  For any distribution that is scheduled to occur on a date that is not a business day then the making of such payment or distribution or the performance of such act may be completed on or as soon as reasonably practical on the next succeeding business day.

### 11.5    Disbursing Agent

If the Plan is consensually confirmed under Section 1191(a), Debtor shall act as the disbursing agent and make all the distributions to all classes as provided for under the Plan. See 11 U.S.C.§ 1194.  Debtor shall not be compensated for acting as disbursing agent.

If the Plan is non-consensually confirmed under Section 1191(b), the Subchapter V Trustee shall disburse all Plan payments unless Debtor requests, and is granted, authority to make the payments directly. See 11 U.S.C. § 1194(b).

If Debtor's Plan is confirmed non-consensually under Section 1191(b), Debtor requests authority to directly pay: (i) all administrative and priority claims under Class 1 and Class 2; and (ii) all secured claims under Class 3 and Class 4. The remaining payments to unsecured non-priority claims under Class 5 will be paid by the Subchapter V Trustee. Debtor will pay $6,000.00 to the Subchapter V Trustee by December 1 and June 1 of each year, until the Non-Consensual General Unsecured Claim Base of $27,000.00 is paid in full. Debtor's first payment to the SubChapter V Trustee will be due on December 1, 2025. The Subchapter V Trustee will disburse the funds to the Class 5 creditors within 60 days of receipt of payment. The Subchapter V Trustee will be compensated for ongoing fees and expenses upon request and as approved by the Court.

### 11.6    Unclaimed Distributions

Returned or otherwise undeliverable Distributions will remain in the possession of Debtor until such time as the distribution becomes deliverable. Debtor may, but shall not be required to, take reasonable steps to attempt to deliver the distribution to the holder of the Allowed Claim. Any holder of an Allowed Claim that does not advise Debtor that it has not received its, his, or her distribution by completion of the Plan will have its, his, or her distribution deposited with the "Unclaimed Funds" at the Bankruptcy Court.

### 11.7    Transfer of Claim

In the event that the holder of any claim shall transfer such claim on or after the Effective Date, such holder shall immediately advise the Reorganized Debtor in writing of such transfer and provide sufficient written evidence. The Reorganized Debtor shall be entitled to assume that no

transfer of any claim has been made by any holder unless and until the Reorganized Debtor shall have received written notice to the contrary. Each transferee of any claim shall take such claim subject to the provisions of the Plan and to any request made, waiver or consent given, or other action taken hereunder and, except as otherwise expressly provided in such notice, the Reorganized Debtor shall be entitled to assume conclusively that the transferee named in such notice shall thereafter be vested with all rights and powers of the transferor under the Plan.

### 11.8    Effect of Pre-Confirmation Distributions

Nothing in the Plan shall be deemed to entitle the holder of a claim that, prior to the Effective Date, received full or partial payment of such holder's claim, by way of settlement or otherwise, pursuant to an order of the Bankruptcy Court, provision of the Bankruptcy Code, or other means, to receive a duplicate payment in full or in part pursuant to the Plan, and all such full or partial payments shall be deemed to be payments made under the Plan for purposes of satisfying the obligations of debtor or the Reorganized Debtor.

### 11.9    No Interest on Claims

Except as expressly stated in the Plan or otherwise allowed by a Final Order of the Bankruptcy Court, no holder of an Allowed Claim shall be entitled to the accrual of post-petition interest or the payment of post-petition interest, penalties, or late charges on account of such Allowed Claim for any purpose.

### 11.10    Compliance with Tax Requirements

In connection with the Plan, the Reorganized Debtor shall comply with all tax withholding and reporting requirements imposed by federal, state, local, and foreign taxing authorities, and all Distributions hereunder shall be subject to such withholding and reporting requirements. Notwithstanding the above, each holder of an Allowed Claim that is to receive a Distribution under

the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding, and other tax obligations, on account of such Distribution.

## ARTICLE XII: AMENDMENTS

Debtor may amend its Plan pursuant to § 1193, which generally provides that:[20] (i) Debtor may amend or modify the Plan at any time before confirmation with notice to the creditors; (ii) Debtor may modify the Plan after confirmation only if the Plan has not been substantially consummated and where the plan comports with the requirements of the Bankruptcy Code; (iii) Debtor may, prior to the Effective Date, make technical changes and adjustments to cure scrivener's errors or typos without order or approval of the Court, provided that such changes and adjustments do not adversely affect any claim in a material way.  In addition, §1193 provides that a holder of a claim that has accepted the Plan shall be deemed to have accepted a Modified or Amended Plan if the proposed modification does not materially alter or adversely change the treatment of the Claim.

## ARTICLE XIII: PREPAYMENT, SETOFF, AND/OR MODIFICATION OF CLAIMS

### 13.1    Prepayment Right

Debtor retains the right to prepay any Allowed Claim, in full, at any time, within its business judgment.

### 13.2    Setoffs

Debtor may, but shall not be required to, setoff against any Claim (for purposes of determining the allowed amount of such claim in respect of which distribution shall be made), any claims of any nature whatsoever he may have against the holder of such Claim.

---

[20] The examples of permissible modifications to a plan under §1193 are provided purely as descriptions.  Nothing in this Plan shall be interpreted as modifying § 1193, which shall control Debtor's ability to modify the Plan.

### 13.3    Modifications

Treatment of any claim may be modified from that provided in the Plan by the mutual consent of the Debtor and any claimant, provided, however, that no modification shall be allowed that improves said claimant's positions compared to others in its class, or results in a higher net recovery compared to others in its class, or otherwise violates any requirement of law or any provision of this Plan.

### ARTICLE XIV: EFFECT OF CONFIRMATION ON THE PLAN

### 14.1    Post-Confirmation Conduct

Upon confirmation of the Plan, the Reorganized Debtor shall have the responsibility of complying with the Plan or shall be entitled to convert the case to a case under Chapter 7 of the Bankruptcy Code.

### 14.2    Discharge

If Debtor's Plan is consensual and confirmed under § 1191(a), on the effective date of the Plan, Debtor will be discharged from any debt that arose before confirmation of this Plan, to the extent specified in § 1141(d)(1)(A) of the Code, except that Debtor will not be discharged of any debt or payment: (i) provided by this Plan; or (ii) to the extent provided in § 1141(d)(6).

If Debtor's Plan is non-consensual and confirmed under § 1191(b), confirmation of this Plan does not discharge any debt provided for in this Plan until the Court grants a discharge on completion of all payments due within the first three years of this Plan or as otherwise provided in § 1192 of the Code.[21]

---

[21] Courts have reached different conclusions regarding the application of § 523 to Subchapter V debtors under § 1192. Debtor's reference to limitations to discharge under § 1192 is not an admission, concession, or determination that § 523 applies to corporate debtors under Subchapter V.

Except as otherwise provided herein, Debtor's discharge, and any payments and distributions made under the Plan, will serve as a full and unconditional settlement, satisfaction, discharge, and release of any and all existing debts and Claims of any kind, nature or description whatsoever against Debtor and its assets, property, or estate, whether considered under this Bankruptcy proceeding or not.  Upon discharge, and except as provided herein, all persons are precluded from asserting against Debtor or any property of Debtor, or any property that is to be distributed under the Plan, any claims, obligations, rights, causes of action, or liabilities based upon any act, omission, transaction, or activity of any kind or nature that occurred prior to the Effective Date, regardless of whether the holder of the claim upon which the debt is based has accepted the Plan and/or is entitled to distributions under the Plan.  After discharge, Debtor may operate, use, acquire, and dispose of any property; may compromise and settle any claims or causes of action without authorization from the Bankruptcy Court; and will be free of any restrictions imposed by the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure.

### 14.3    Term of Bankruptcy Injunction or Stays

Unless otherwise provided in the Confirmation Order, all injunctions or stays provided for in this case under 11 U.S.C. §§ 105 or 362 and in existence on the Confirmation Date shall remain in full force and effect until the Effective Date.

### 14.4    Effect of Confirmation on Liens

Debtor may apply to the Court for an order directing any necessary party to execute or deliver, or join in the execution or delivery of, any instrument required to effect a transfer of property covered by the Plan and to perform any other act, including satisfaction of a lien, that is necessary for the consummation of the Plan.  See 11 U.S.C. § 1142(b).  Any unreasonable

withholding of such delivery by any Claim holder will entitle Debtor to the costs and fees of seeking such delivery, as approved by the Court.

### 14.5    Causes of Action Reserved and Preserved

As of the Effective Date, any and all Causes of Action, including, without limitation, Avoidance Actions accruing to Debtor under Chapter 5 of the Bankruptcy Code or otherwise specified in this Plan, shall, to the extent not otherwise specifically addressed herein, be preserved by Debtor.

### 14.6    New Obligations

In light of the foregoing discharge of obligations, the Plan, and the payments promised herein, create new contractual obligations that replace those obligations to creditors that existed prior to the Effective Date.

### 14.7    Material Default

If Debtor (i) fails to make any payment required under this Plan, or (ii) fails to perform any other obligation required under this Plan for more than 14 days after the time specified in this Plan, then any affected creditor, interest holder, or other party in interest may file and serve upon Debtor and Debtor's attorney (if any) a written notice of default at their most recent address(es) listed in this case.  Debtor is in material default under this Plan if Debtor fails within 30 days after service of that notice of default, plus an additional five days if served by mail, to cure the default, file an answer responding to the default with a request for a hearing on the matter, obtain from the Court an order extending the time to cure the default, or the Court determines that no material default occurred.

Except as otherwise provided herein, to the extent that Debtor has assumed an executory contract or unexpired lease, or to the extent that a creditor retains a lien under this Plan that was a

consensual lien, the default provisions of that contract, lease, or lien documentation govern what constitutes a default for purposes of the rights and remedies thereunder, all subject to applicable non-bankruptcy law and any exceptions set forth in this Plan.

If the Debtor materially defaults under this Plan and fails to cure the material default through the provisions contained herein, then creditors may exercise all remedies available under non-bankruptcy law for the collection of its claim or upon request of a creditor, the Subchapter V Trustee, or the United States Trustee's Office, the Debtor's case may be converted or dismissed.

## ARTICLE XV: GENERAL PROVISIONS

### 15.1    Severability

If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

### 15.2    Binding Effect

If the Plan is confirmed, the rights and obligations of any entity named or referred to in this Plan will be binding upon, and will inure onto any successors or assigns of such entity, whether the entity has accepted the Plan or whether the entity is entitled a distribution under the Plan.

### 15.3    Notices

In order to be effective, all notices, requests, and demands to or upon Debtor shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received, addressed as follows:

Matchbox Business, LLC
Attn: Steven M. Bylenga
CBH Attorneys & Counselors, PLLC
25 Division Ave S., Suite 500
Grand Rapids, Michigan 49503

Matchbox Business, LLC
Attn: Nathan Orange
1345 Lake Dr. SE
Grand Rapids, Michigan 49506

## <u>ARTILE XVI: JURISDICTION OF COURT</u>

The Court shall retain jurisdiction of all matters arising out of, and related to, the Chapter 11 Case and the Plan pursuant to, and for purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

A.    To hear and determine any and all objections to the allowance of claims, including Administrative Expense Claims;

B.    To hear and determine pending applications for the assumption or rejection of executory contracts or unexpired leases and the allowance of any claims resulting therefrom;

C.    To hear and determine any and all contest matters and/or adversary proceedings pending on the Effective Date;

D.    To enter and implement such orders as are necessary to implement the provisions of this Plan and to resolve any dispute arising from the implementation of the Plan;

E.    To consider all modifications of the Plan, remedy and defect or omission or reconcile any inconsistency in any order of the Court, including the Confirmation Order to the extent authorized by the Bankruptcy Code;

F.    To hear and determine all actions pursuant to §§ 105, 502, 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code, and any collection matters related thereto and settlements thereof;

G.    To resolve any dispute in the Debtor's interests in property;

H.    To hear and determine any requests by Debtor to sell any asset pursuant to section 363 of the Bankruptcy Code;

I.    To hear and determine all controversies, suits, and disputes arising in connection with the interpretation, implementation, enforcement or consummation of the Plan;

J.    To enforce the provisions of this Plan; and

K.    To enter a final decree closing this case.

## ARTICLE XVII: POST CONFIRMATION CONDUCT

**17.1    Substantial Consummation**

Under either a consensual or non-consensual plan of reorganization, the Reorganized Debtor shall file notice of substantial consummation of the Plan in accordance with 11 U.S.C. §§ 1183(c)(2), 1101(2).  Upon substantial consummation of a consensual plan, the Trustee's services will terminate as provided under 11 U.S.C. §§ 1183(c)(1), 1101(2).  Upon confirmation of a non-consensual plan, the Trustee's services will continue after substantial consummation as the disbursing agent under 11 U.S.C. § 1194(b).

**17.2    Post-Confirmation Employment and Compensation of Professionals**

From and after the Effective Date, Debtor may, in the ordinary course of business and without the necessity of any approval by the Court, employ and/or retain the services of attorneys, accountants, and other professionals as it deems necessary in the ordinary course of business. Debtor may pay the post-confirmation fees and expenses of such professional persons for any matter as to which such professionals are employed.

## ARTICLE XVIII: VESTING OF ESTATE ASSETS

**18.1    Vesting of Assets in Reorganized Debtor**

Upon the Effective Date of the Plan, the assets of the Estate shall vest in the Reorganized Debtor pursuant to 11 U.S.C. § 1141(b).

**18.2    Revesting of Assets in the Event of Conversion to Chapter 7**

In the event that Debtor's Chapter 11 proceeding is converted to a case under Chapter 7 of the Bankruptcy Code, the Debtor's property is not deemed to vest in the Reorganized Debtor pursuant to 11 U.S.C. § 1141(b).  The Reorganized Debtor's property shall be revested in the Estate and shall be subject to the continuing jurisdiction of the Bankruptcy Court.

## ARTICLE XIX: STATUTORY DISCLOSURES

Orange and his minor children are insiders of the Debtor.  Orange and his minor children receive wages, which are already included as an expense in Debtor's Cash Flow Projections.

## ARTICLE XX: CONCLUSION

For the reasons set forth herein, Debtor believes that confirmation of this Plan is in the best interests of the Debtor's creditors.

Respectfully Submitted,

**CBH Attorneys & Counselors, PLLC**

Dated: 04/02/2025            By:    /s/ *Steven M. Bylenga*
Steven M. Bylenga (P73492)
Attorney for Debtor
25 Division S., Suite 500
Grand Rapids, Michigan 49503
Tel.:    (616) 608-3061

Dated: 04/02/2025            By:    /s/ *Nathan Orange*
Nathan Orange
Member of Matchbox Business, LLC